**Kareem MANGAROO, Plaintiff,**

v.

**BOUNDLESS TECHNOLOGIES, INC., Boundless Corp., Joseph Gardner, Michelle Flaherty, Thomas Iavarone and Anthony San Martin, Defendants.**

No. 01–CV–634(TCP)(MLO).

United States District Court,
E.D. New York.

Feb. 17, 2003.

Harriet A. Gilliam, Law Offices of Harriet A. Gilliam, Riverhead, NY, for Kareem Mangaroo.

Robert S. Whitman, Orrick, Herrington & Sutcliffe, New York City, for Boundless Technologies Inc., Boundless Corp., Joseph Gardner, Michelle Flaherty, Thomas Lavarone, Anthony Sanmartin.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Plaintiff Kareem Mangaroo ("Mangaroo" or "Plaintiff"), a former employee in

the shipping department of Defendant Boundless Technologies Inc. ("Boundless" or the "Company") brings this action against Boundless and four current or former employees for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); 42 U.S.C. § 1985(3) ("Section 1985"); and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Plaintiff also asserts a claim for breach of contract under New York law.

Presently before this Court is Defendants' Motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure to dismiss the Complaint in its entirety on the grounds that there are no genuine issues of material fact for trial.

For the reasons stated below, Defendants' Motion is GRANTED and the Complaint is dismissed in full.

## BACKGROUND [1]

### A. General Background

Plaintiff Mangaroo is an African–American male who resides in the Town of Islip, New York. Plaintiff was terminated from his employment from Boundless on April 20, 1999. In this action, Plaintiff alleges, *inter alia*, that his termination and pre-termination suspension from Boundless were discriminatory on account of his race. Defendants deny any discriminatory action against Plaintiff and assert that he was disciplined and later terminated for legitimate nondiscriminatory reasons.

Boundless manufactures and distributes computer hardware to businesses for use

with networking application.[2] Defendant Boundless Corp. is the corporate parent of Boundless. Defendants Joseph Gardner ("Gardner"), Michelle Flaherty ("Flaherty"), Thomas Iavarone ("Iavarone"), and Anthony San Martin ("San Martin") are current or former employees of Boundless.

Plaintiff contends that he began his employment with Boundless as a temporary employee in the shipping department in 1993 and that he was appointed to a full-time position in 1994. Defendants contend that Plaintiff was hired in February 1994 as a clerk in the shipping and receiving department.

Plaintiff claims that he was "reclassified" as a Material Handler in July 1996, and subsequently as Lead Material Handler in 1998, which he contends were lateral classifications. (Pl. 56.1 Stmt. ¶¶ 7, 8.) Defendants allege that these were not reclassifications, but promotions based on recommendations from his supervisor San Martin in 1996 and on a recommendation from his second-level supervisor Iavarone in 1998. (Def. 56.1 Stmt. ¶¶ 5, 6; Gilliam Decl. Ex. J.) Plaintiff contends that as a Material Handler and Lead Material Handler he was an hourly employee thereby having non-exempt status under Boundless' employee policy. Defendants state that Mangaroo's pay rate was $12.76 per hour, for an annual salary of $26,540.80.

### B. Plaintiff's Attendance

During the course of his employment, Plaintiff attended college and participated in the Boundless Inc. Tuition Reimbursement Plan. Plaintiff alleges that at the time of his hire, he had an understanding with his supervisor, San Martin, and his second-level supervisor, Iavarone, that he

---

**1.** Except as noted, the facts are derived from the parties' Local Rule 56.1 Statements and are not in dispute.

**2.** Boundless was known as Applied Digital Data Systems until 1994, when it was renamed Sun River Data and later changed its name to Boundless.

would work flexible hours, starting anywhere from 6:30 am and 9:30 a.m. (Pl. 56.1 Stmt. ¶¶ 10, 11.)

On March 18, 1999, San Martin and another supervisor of the shipping department held a meeting with the department's employees to discuss the importance of good attendance and adherence to scheduled work hours. Everyone in the department attended the meeting and Plaintiff's time records show that he was at work on that day.

San Martin summarized this meeting in a memo dated March 18, to the department's employees, noting each employee's schedule (the "Memo"). The Memo stated, "[a]n overall decline in attendance, breaks, and lunch time has been noted. All hourly employee's in department 551 are subject to follow the following schedule." (Whitman Decl. Ex. 14.) According to the Memo, Plaintiff's work hours were 8:30 am to 5:00 p.m. on Tuesday, Thursday, and Friday and 7:30 a.m. to 4 p.m. on Monday and Wednesday. Plaintiff's schedule was an accommodation to the college courses he was taking.

On March 22, 23, and 24, 1999, Plaintiff was late for work based on Plaintiff's schedule set forth in the Memo. (Whitman Decl. Ex. 11; Gilliam Decl. Ex. N.) San Martin noted Plaintiff's attendance by marking an "L" on Plaintiff's time cards. (Gilliam Decl. Ex. N.) Defendants claim that on March 24, San Martin warned plaintiff about his tardiness and reiterated the importance of arriving on time, especially since plaintiff served as a team leader and was expected to be a role model for other employees. (Whitman Decl. Ex. 11.) According to a Notice of Disciplinary Action dated March 24, Plaintiff expressed the view that the Company's attendance policy did not apply to him, and he refused to acknowledge the warning in writing. (Id.) At his deposition Plaintiff did not

recall refusing to acknowledge the warning. (Gilliam Decl. Ex. BB.) Plaintiff also contends that he did not receive the March 24 Notice until April 15.

Plaintiff was also late on March 26, 29, 30, and 31. San Martin issued another Notice of Disciplinary Action dated April 1, which states that Plaintiff crossed out the late-marks on his time-sheets and once again stated that lateness did not apply to him. (Whitman Decl. Ex. 10.) Plaintiff testified that he did not cross out the late-marks. (Def.Ex. BB.) Plaintiff also alleges that he did not receive the Notice dated April 1 until April 15.

Plaintiff further contends that the schedule set forth in the Memo was only enforced against him and that he was still allowed to accrue overtime. (Pl. 56.1 Stmt. ¶ 18; Gilliam Decl. Ex. N.) In particular, he points to a co-worker, Steven Scola ("Scola"), whom he claims was treated more favorably. (Id. at 19.)

Plaintiff did not show up for work on April 1 and began a pre-approved vacation from Friday, April 2 through Friday, April 9. Plaintiff was due back on Monday, April 12, but did not show up until April 14 and he failed to call in his absences. Plaintiff claims that he had arranged to take April 1 as a vacation day and that April 13 and April 14 were sick days. A Notice of Disciplinary Action dated April 13 noted these absences. (Whitman Decl. Ex. 9.)

## C. Plaintiff's Pre–Termination Discipline

San Martin and Iavarone met with Plaintiff for several hours on April 14 to discuss Plaintiff's attendance. A letter from Iavarone to Flaherty dated April 16, details this meeting. (Whitman Decl. Ex. 7.) Regarding the March 24 and April 1 Notices, Plaintiff reiterated his belief that the attendance policy did not apply to him.

(Id.) Furthermore, Plaintiff provided no indication that he would comply in the future. Regarding the April 13 Notice, the letter states that there may have been a mis-communication between San Martin and Plaintiff regarding the April 1 absence. Due to this finding, Iavarone withheld a decision and told Plaintiff that they should meet again the next morning. (Id.)

On April 15 Iavarone and met with Flaherty, the manager of Human Resources. They decided to reduce the suspension to two days from the originally proposed three days, based on the miscommunication regarding April 1. Iavarone then met with Plaintiff to let him know of the decision. Plaintiff was unhappy about the suspension and requested a meeting with Human Resources and the names and numbers of the Vice President of Operations, the CFO and the President of the company. (Id.)

Plaintiff was then escorted to meet with Flaherty. During the meeting, Plaintiff requested that Gardner join the conversation. Gardner, Iavarone and Flaherty then met with Plaintiff for three hours. During the conversation, Plaintiff raised concerns about San Martin's management of the shipping department. Plaintiff also contends that he expressed that San Martin had failed to conduct a timely evaluation of him, that San Martin had failed to honor Plaintiff's flex-schedule and that the Notices of Disciplinary Action were based on false or erroneous information. Based on Plaintiff's comments, Flaherty agreed to conduct an investigation of San Martin's management.[3] The discussion ended in Plaintiff's two-day suspension. The Plaintiff contends that Gardner and Flaherty further directed Plaintiff to report to Flaherty's office in Human Resources upon his return from suspension in order to discuss the findings of the investigation.

On the first day of his suspension, Plaintiff entered the building on April 16 to use the telephone. (Id.) Iavarone asked him to leave. Plaintiff contended that he needed to communicate with another individual in the building, whom he refused to identify, to reschedule a meeting. (Id.) Gardner subsequently joined the discussion and alerted Plaintiff that he was not allowed on the premises, although it might have been possible for Plaintiff to have misunderstood this. Plaintiff was then escorted out. (Id.)

### D. Plaintiff's Termination

On Tuesday, April 20, 1999, Plaintiff returned to work. Instead of clocking in or reporting to his work area, Plaintiff went directly to Human Resources. Plaintiff asked a secretary in Human Resources if he could to speak to Flaherty but was told she was in a meeting. Iavarone approached a few minutes later and asked him why he did not report to the shipping department. After Plaintiff stated that he needed to speak to Flaherty, Iavarone notified him that she unavailable and that both Flaherty and he would meet with him that afternoon. (Whitman Decl. Ex. 12.) Iavarone then requested that Plaintiff report to the shipping department. (Id.) Plaintiff refused. Iavarone again asked that Plaintiff report to shipping. Plaintiff again refused. (Id.)

According to a letter written from Iavarone to Flaherty on April 21, Iavarone returned to his office and called Ron Lovell, the Company's security officer. (Whitman Ex. 12.) Iavarone again told Plaintiff to report to his department. Plaintiff stated he would comply but only after he had collected his thoughts. (Id.) After another

---

**3.** The investigation revealed that the other team members had no problems with San Martin's management. (Whitman Decl. Ex. 8.)

request from Iavarone and Plaintiff's subsequent refusal, Iavarone stated that it was his opinion that this was an insubordinate act and that Plaintiff's employment was terminated. (Id.)

Lovell was then asked to escort Plaintiff out. Plaintiff stated he would not leave until he spoke to Flaherty. (Id.) At this point, Iavarone involved Gardner, who then ordered that Plaintiff be removed, and if he refused to comply, that the police should then be called to intervene. Plaintiff then left the premises. (Id.) While Plaintiff's testimony of these events is slightly different, Plaintiff admits that he did not report to work after being directed to do so by Iavarone. (Gilliam Decl. Ex. BB at 199; Pl. Mem. In Opp. at 6–7.)

### E. The Unemployment Proceedings

After his termination, Plaintiff applied for unemployment benefits. Boundless opposed the motion on ground that Plaintiff's insubordination rose to the level of "misconduct". Following the hearing, the Administrative law Judge ("ALJ") denied the Plaintiff's application for benefits. Plaintiff appealed, and pursuant to a remand order, another hearing was held on October 15, 1999. The second ALJ upheld the prior decision and found that:

> "The credible evidence establishes that the Plaintiff refused to report to work after being told to do so repeatedly by a supervisor ... the weight of the evidence supports the employer's position. The Plaintiff's repeated refusal to report to work when directed to do so is insubordination and rises to the level of misconduct."

(Whitman Decl. Ex. 19.)

Plaintiff appealed the decision of the second ALJ judge. In a December 28, 1999, decision, the above finding was affirmed by the State of New York Unemployment Insurance Appeal Board. (Whitman Decl. Ex. 20.)

Plaintiff contends that Flaherty gave conflicting reasons for Plaintiff's termination at the unemployment hearings. This is unsupported from the part of the transcript provided by Plaintiff. From the testimony provided, Flaherty states that "[t]here were several events that took place that lead up to the termination of his employment." (Gilliam Decl. Ex. V.) However, she states explicitly that Plaintiff's insubordination was a basis for Plaintiff's termination. (Id.) In addition, the Summary Interview with the Department of Labor also lists insubordination. (Gilliam Decl. Ex. U.)

### F. The Boundless Employee Handbook

Plaintiff also relies on the Boundless Employee Handbook (the "Handbook"). The Handbook states that it "is presented as a matter of information only and its contents should not be interpreted as a contract between the Company and any of its employees." (Whitman Decl. Ex. 6 at 4.) The Handbook further states that, "we expressly reserve the right to change any of our policies, including those covered here, at any time." (Id.) Plaintiff signed an acknowledgment that stated he understood that his employment was "at will". (Id. at 5.)

Plaintiff claims that the Handbook's open door policy and complaint handling procedure gave him the right to wait at Flaherty's office on the day of his termination. In the opening statement, J. Gerald Combs, President and CEO, writes, "please do not hesitate to approach us; at Boundless Technologies there is an open door policy." Under the section entitled *Complaint Handling Procedure*, the Handbook states:

> "If the discussion with your supervisor does not answer your question or re-

solve the matter to your satisfaction, you may present your complaint, orally or in writing, to the next higher level of management. If the matter still is not resolved satisfactorily, you may present your complaint to the Human Resources Manager." When the issue personally involves the supervisor or manager with whom you would ordinarily discuss a problem, you may bypass that individual and proceed to the next person in authority without fear of reprisal. At any time you may seek the advice and guidance of our Human Resources Manager. (Id. at 25.)

The Handbook also provides that hourly employees and non-exempt employees (those eligible for overtime pay) are scheduled to be reviewed every 6 months and that exempt employees (those not eligible for overtime pay) are reviewed annually. (Id. at 6–7.) The stated purpose of the reviews are to "provide[ ] a vehicle to review your strengths and point out ways to improve your performance." (Id. at 7.)

### G. Performance Reviews

Plaintiff was a non-exempt, hourly employee. According to the Handbook, such employees are to be evaluated every six months. Plaintiff had received an evaluation approximately every six months, beginning December 4, 1995 up to February 9, 1998.[4] (Gilliam Decl. Exs. E, J.)

Although not stated in the Handbook, Flaherty and San Martin testified that when an employee's salary reaches the midpoint for his salary grade, reviews are given annually. (Whitman Decl. Ex. 2 at 81.) Defendants state that Plaintiff received a raise in February 1998 that placed him above the applicable midpoint and therefore allegedly moved him to an annu-

al review cycle. (Pl. 56.1 Stmt. ¶ 75.) Based on the fact that Plaintiff was on disability for two months at the end of 1998, his next review was therefore rescheduled for April 1999, the month Plaintiff was terminated. (Id. at 9.) Plaintiff contends that he was never apprised of this change in his review cycle, that he should have received a review in either August 1998 or February 1999 and that he repeatedly requested a review from San Martin. (Def. 56.1 Stmt. ¶ 25; Gilliam Decl. Ex. BB at 110.)

### H. Promotions

According to the Handbook, the Company has a policy of promoting from within and posts current job openings on the Boundless bulletin board and e-mails them when appropriate. (Whitman Decl. Ex. 6.) Plaintiff never formally applied for any promotion, but had asked Flaherty to let him know if an appropriate position opened up. (Whitman Decl. Ex. 1 at 84–91.) With respect to a 1998 opening at the Company's Atlanta facility in which Plaintiff had expressed interest, another African–American employee applied for the position and received it. (Green Decl. ¶ 9.)

### I. Stock Options

Plaintiff received a grant of 200 stock options from All–Quotes, Inc., a corporate predecessor of the Company on July 31, 1995. According to the written agreement memorializing that grant, the options may not be exercised unless the optionee is an employee at the time of exercise. (Green Decl. Ex. 3.) It also provides that, if the employee is terminated "for cause," the option "shall forthwith terminate immediately upon such termination." (Id.) The

---

4. The last performance review has two dates on it; February 9, 1998 and March 27, 1998. While the exact date is immaterial, the Court will use the earliest date on the Performance Review, February 9, 1998.

options were to fully vest on May 1, 1999. Since he was terminated for cause prior to this date, Plaintiff was unable to exercise the options.

### J. Plaintiff's Claims

Count I of the Complaint is against the Company for race discrimination pursuant to Title VII, for race discrimination with respect to (i) performance reviews (ii) opportunities for promotion (iii) application of its procedures on complaint handling (iv) job posting and (v) attendance. (Compl.¶ 12.)

Counts II through V are against each of the individual defendants (employees of the Company) for discrimination pursuant to Section 1981. Count II against San Martin alleges that San Martin improperly failed to provide Plaintiff with performance reviews and inappropriately accused Plaintiff of excessive lateness, all "with a view towards discrimination." (Compl.¶ 66.) Count III, against Flaherty, alleges that she discriminated against Plaintiff by giving false testimony at the unemployment hearing and that she gave Plaintiff false information concerning a position in Atlanta, Georgia, also on account of his race. (Compl.¶¶ 73–74.)

Count IV is against Gardener and alleges that Gardener discriminated against him by failing to follow the complaint handling procedure by inappropriately approving Plaintiff's termination. (Compl.¶¶ 78, 80.) Plaintiff also contends that Gardener gave false testimony at the unemployment hearing. In Count V, Plaintiff alleges that Iavarone terminated plaintiff on the account of his race. (Compl.¶ 86.)

Count VI is against the Company for a denial of benefits on account of race pursuant to ERISA. Count VII is against the individual defendants and alleges that the individual defendants conspired to deny Plaintiff equal protection and to terminate him pursuant to Section 1985. Count VIII asserts a claim for breach of contract under New York Law based on the Handbook.

Defendants deny any discriminatory action against Plaintiff and assert that Plaintiff's termination was due to insubordination. Defendants further argue that § 1985(3) and ERISA do not provide a legally cognizable claim and under the Stock Option Plan the options may not be exercised if the optionee was terminated for cause. Defendants also argue that the Handbook does not constitute a legally binding contract and that the procedures outlined therein were followed.

## DISCUSSION

### A. Summary Judgment Standard

A motion for summary judgment may not be granted unless the court determines that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Castle Rock Entm't, Inc. v. Carol Pulb'g Group,* 150 F.3d 132, 137 (2d Cir.1998). The party seeking summary judgment bears the burden of demonstrating that no genuine factual dispute exists. *Adams v. Department of Juvenile Justice,* 143 F.3d 61, 65 (2d Cir.1998).

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Sim v. New York Mailers' Union Number 6,* 166 F.3d

465, 469 (2d Cir.1999)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348 (citation omitted). The nonmoving party must show that a disputed material fact exists in light of the substantive law by offering "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988) (quoting *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505).

## B. Title VII and Section 1981 Claims

### 1. Legal Standard

Title VII provides, in pertinent part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

Section 1981 provides, in pertinent part, that, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." Employment discrimination claims under Title VII and Section 1981 are both decided under the same burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Choudhury v. Polytechnic Inst. of New York*, 735 F.2d 38, 44 (2d Cir.1984); *Hudson v. IBM Corp.*, 620 F.2d 351, 354 (2d Cir.1980).

Under the *McDonnell Douglas* framework, a plaintiff who lacks direct evidence of discrimination may establish a violation of Title VII through a three-step process. The initial burden is on the plaintiff to establish a *prima facie* case of discrimination. To establish a *prima facie* case of racial discrimination, the Plaintiff must show that (1) he was a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment action; (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir.2001). The burden upon the plaintiff to prove a prima facie case is minimal. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir.), cert. denied, 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000)

If the plaintiff meets this burden, the employer must articulate a legitimate nondiscriminatory reason for the employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the employer does so, the presumption of discrimination that arises from the *prima facie* case "drops out of the picture" and plaintiff must come forward with evidence that the proffered reason is a mere pretext for actual discrimination. *Adeniji v. Admin. for Children Services, NYC*, 43 F.Supp.2d 407, 420 (S.D.N.Y.1999) (citations omitted). Therefore, once an employer has put-forth nondiscriminatory reasons for its employment action, it is entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Buompane v. Citibank, N.A.*, 2002 WL 603036, at *12 (S.D.N.Y. April 18, 2002) (quoting *James v. New York Racing Assoc.*, 233 F.3d 149, 154 (2d Cir.2000)). In order to prove pretext, the plaintiff must show "both that the [stated] reason was false,

and that discrimination was the real reason" for the employment action. *Ponniah Das v. Our Lady of Mercy Med. Ctr.*, 2002 WL 826877 at *9 (S.D.N.Y.2002) (quoting *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1225 (2d Cir.1994)).

### 2. Plaintiff's Termination

In Count V, Plaintiff contends that Iavarone improperly terminated him on the basis of race in violation of Section 1981. In their briefs, Defendants argue that Plaintiff has failed to meet the fourth prong of the *prima facie* case: whether the circumstances give rise to an inference of discrimination. (Def. Mem. In. Supp. at 10.)

Plaintiff argues that the circumstances surrounding his termination give rise to an inference of discrimination because, (1) the alleged inconsistent reasons given at the employment hearing for his termination (2) that he was entitled to be at the Human Resources Department according to the Handbook and because he was told to report there and (3) that his position was eventually filled by an Hispanic. (Def. Mem. In Opp. 14–16.)

The first of these contentions is not supported by the record. Plaintiff argues that Defendants first argued to the New York State Department of Labor that he was terminated for failure to report to work then that he was fired for violating policies and finally that he was released for insubordination. (Def. Mem. In Opp. 16.) However, the Summary of Interview before the Department of Labor, which Plaintiff claims shows he was terminated for failure to report to work, while difficult to read, mentions insubordination. (Gilliam Decl. Ex. U.) Furthermore, the one page of transcript submitted by Plaintiff from the deposition of Flaherty states,

> There were several events that took place that led to the termination of employment. He was suspended [and] upon return of his suspension he had come in and asked to meet with me[e]t with me [and] did not report to work. (Gilliam Ex. V.)

The Court finds that this testimony does not evidence contradictory reasons for Plaintiff's termination. Indeed, the uncontradicted record indicates that Defendants consistently stated the events which led up to Plaintiff's termination. Failure to report to work, violating company policies and insubordination all relate to the same incident.

While the Court finds the remaining contentions insufficient in themselves, taken together and remembering that the Plaintiff has a minimal burden in meeting the *prima facie* case, the Court concludes that Plaintiff has sufficiently met this requirement. "[A] plaintiff can avoid dismissal by presenting the 'minimal' prima facie case ... [t]his requires no evidence of discrimination." *James*, 233 F.3d 149.

Even assuming that Plaintiff has established a *prima facie* case, Defendants have set forth a clear nondiscriminatory reason for Plaintiff's termination namely his insubordinate refusal to report to his work station. Plaintiff admits that he refused Iavarone's direct instruction to report to his work station. (Def. Mem. In Opp. at 6–7; Pl. Dep. at 199.) "Unwillingness to follow a supervisor's orders is a legitimate nondiscriminatory reason for terminating an employee's employment." *Ponniah Das v. Our Lady of Mercy Med. Ctr.*, 2002 WL 826877 at *9 (S.D.N.Y.2002).

Defendants having proffered a legitimate nondiscriminatory reason for termination, Plaintiff must come forward with evidence that such reason is a mere pretext. This Plaintiff has not done. "Once the employer has given an explanation, there is no arbitrary rule or presumption

as to sufficiency ... the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular· evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove-particularly discrimination." *Id.* at *7 (citing *James* 233 F.3d at 149.)

The record in this case provides no evidence of discrimination. It is undisputed that Plaintiff failed to return to work when instructed to do so by Iavarone. Even if we assume *arguendo,* that Plaintiff had been instructed to report to Human Resources, he still violated a later instruction, provided directly from a supervisor to return to his work station, and he was told that he could meet with Flaherty after her meeting ended. (Whitman Decl. Ex. 12, 17 at 17–22.)

Furthermore, there is no evidence that the complaint handling procedure was not followed in this case. The records indicate that Defendants followed this procedure throughout its dealings with Plaintiff. (Whitman Decl. Ex. 7.) San Martin, Iavarone, Flaherty and Gardener spent numerous hours discussing Plaintiffs concerns with him. While the Handbook allows Boundless employees to seek the assistance of the Human Resources Manager, the sole fact that Flaherty was occupied at the time and could not meet with him does not evidence a departure from policy nor create an inference of discrimination.

Plaintiff has not provided any evidence that other employees who acted in such a manner, namely engaged in insubordination, were treated differently. As discussed *supra,* Defendants did not give conflicting reasons for Plaintiffs termination. The mere fact that someone of a different race was eventually hired to replace Plaintiff, is not sufficient in and of itself to support a finding that Plaintiff was terminated due to his race. *See James,* 233 F.3d at 155 n. 1.

In sum, there is no evidence that Plaintiff was discharged due to racial animus. Plaintiff was terminated for insubordination and this was the finding of the two Administrative Law Judges. This Court has thoroughly searched the record and has found no evidence to suggest that Plaintiff's termination was for any other reason than insubordination. Accordingly, the Court dismisses Count V of the Complaint.

### 3.· Pre–Termination Discipline

█ Plaintiff contends he was disciplined and suspended prior to his termination due to racial animus. Even if we assume that Plaintiff has met his *prima facie* burden regarding this claim, Defendants have proffered legitimate and non-discriminatory reasons for such discipline; namely, unexcused lateness and absenteeism.

The record is uncontroverted that Plaintiff failed to comply with the Memo and that he was repeatedly late. This clearly constitutes a legitimate reason for his suspension. Plaintiff's argument that he had a "flexible" schedule may have been true at some point but it was clearly not the case after the Memo issued on March 18, 1999, which clearly sets forth Plaintiff's hours. (Whitman Decl. Ex. 14.) ·

Another reason for Plaintiff's suspension was his unexcused absences on April 12 and April 13. However, the record shows that Iavarone and Flaherty gave Plaintiff the benefit of the doubt regarding the April 1 absence and reasonably found that a two-day suspension was warranted based on his recent record and disciplinary warnings.

While Plaintiff alleges disparate treatment based on the Company's disciplining of Steven Scola, a Caucasian, the record contains no evidence that Scola engaged in

similar transgressions as Plaintiff. In order to show disparate treatment, a party must show that other individuals were "similarly situated" in "all material respects." *Shumway v. UPS*, 118 F.3d 60, 64 (2d Cir.1997). Plaintiff has failed to meet this burden.

Scola's time cards do evidence that he was late after the Memo was issued and that these were not recorded on his timesheets. (Gilliam Ex. O.) However, Scola was not similarly situated in "all material aspects." First of all, Plaintiff's suspension was related to both his tardiness and his absenteeism. Secondly, each employee had a different supervisor. "[I]n order to be similarly situated, other employees must have the same supervisor as the plaintiff, must have been subject to the same discipline, and must have engaged in similar conduct." *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531, 1547 (S.D.N.Y.1986). The fact that San Martin correctly noted that Plaintiff was late, while Scola's supervisor apparently did not, does not show that San Martin was motivated by race. Even if San Martin did have a bias against Plaintiff, Plaintiff himself testified that it was because Plaintiff had been pressuring him for a performance review. (Whitman Decl. Ex. 1, Pl. Dep. at 172–73, 179.) Thirdly, there is no evidence that Scola acted towards his supervisor in the same manner that Plaintiff did. Aside from Plaintiff's unsupported assertions, the contemporaneous written record shows that Plaintiff crossed out the "L" 's on his time-sheets and stated that the schedule in the Memo did not apply to him. Accordingly, it is clear that Plaintiff and Scola were not similarly situated. (Whitman Decl. Exs. 7, 9.)

Therefore, the Court finds that there is no evidence that discrimination was the real reason for Plaintiff's pre-termination discipline.

### 4. Performance Reviews

■ According to the Handbook, Plaintiff was a non-exempt hourly employee and was therefore entitled to a review every six months. It is also undisputed that he received reviews approximately every six months until early 1998. While Defendants contend that Plaintiff had been changed to an annual review due to reaching the midpoint of his review cycle, there is no evidence that this was communicated to Plaintiff. Due to Plaintiff's minimal burden in establishing a *prima facie* case, the Court finds that this apparent failure to follow Company policy is sufficient to raise an inference of discrimination. Accordingly, Plaintiff has met his minimal burden in proving in establish his *prima facie* case.[5]

Defendant's proffered reason is that Plaintiff was not due for a review until April 1999. "If the employer offers, via admissible evidence, a justification of its action which, if believed by a reasonable trier of fact, would allow a finding of no unlawful discrimination, then 'the McDon-

---

**5.** Defendants also point out that failure to receive a timely review is not actionable because it is not "materially adverse change" in the terms and conditions of his employment. *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2d Cir.1999) (stating that "because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.' ")(quoting *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997)). However, this would appear to be an issue of fact, since Plaintiff has alleged that this would have increased his chances for promotion and the record indicates that Plaintiff's previous promotions occurred at the time of his review. (Gilliam Decl. Ex. F.) The Court does note that, especially in light of Plaintiff's attendance problems in early 1999, there is no reason to believe that Plaintiff would have received a favorable review.

nell Douglas framework-with its presumptions and burdens-disappears, and the sole remaining issue [is] discrimination vel non.'" *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir.2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000)).

Plaintiff has failed to provide evidence "both that the [stated] reason was false, and that discrimination was the real reason" for the employment action. *Ponniah Das v. Our Lady of Mercy Med. Ctr.*, 2002 WL 826877 at *9 (S.D.N.Y.2002) (quoting *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1225 (2d Cir. 1994)). Specifically, Plaintiff has provided no support that other similarly situated employees received reviews every six months or that San Martin did not provide a earlier review because of Plaintiff's race. The record is devoid of any evidence that Boundless failed to uniformly apply its performance-review policy. As the Handbook clearly states, it is only a summary of the Company's policies and they may be changed at any time. The fact that Plaintiff had received reviews previously further undermines his argument that he did not receive a timely review due to racial animus. Since the Plaintiff has failed to meet his burden of proffering some evidence that his failure to receive a timely-review was based on race and the weakness of the *prima facie* case, the Court dismisses this claim.

### 5. Promotions

The record shows that Plaintiff never formally applied for any position. Plain-

**6.** In his deposition Plaintiff claims he inquired about an opening at the Atlanta facility. (Pl.Dep.90–91.) However, he also states that he only spoke generally to Flaherty about the position. (Id.) In any event, it is not disputed that the position was eventually filled by an African–American. (Def. 56.1 Stmt. ¶ 81; Green Decl. ¶ 9.)

tiff's testimony reveals that he only had general discussions with Flaherty that he "wanted a position that opened up in the accounting department or the marketing department. Whatever department it may have been." (Whitman Decl. Ex. 1 at 84–91.) The record also shows that Plaintiff was promoted previously, which further undermines his claim. (Gilliam Decl. Ex. F.) Moreover, Plaintiff's brief contains no statements in support his argument. Because Plaintiff has not shown a position for which he applied and was rejected Defendants' motion is granted as to this claim.[6]

### C. ERISA

In the Complaint, Plaintiff alleges that Boundless, "through its discriminatory termination of plaintiff denied plaintiff benefits under a defined benefit plan, its stock option plan, on account of his race, in violation of ERISA." (Compl.¶ 90.) Since the Court finds, *supra*, that Plaintiff's termination was for a legitimate nondiscriminatory reasons, this claim is similarly dismissed.[7]

### D. 1985(3)

In Count VII, Plaintiff alleges that the individual defendants conspired to commit race discrimination in violation of 42 U.S.C. § 1985(3). However, both the Supreme Court and Second Circuit have held "that in light of the enforcement and conciliation mechanism created by Congress for claims under Title VII, the deprivation of a right created by Title VII

**7.** As Defendants note, Plaintiff improperly raises the theory *de novo* in his Memorandum of Law in Opposition that Boundless violated 29 U.S.C. § 1140, ERISA section 510, by terminating him in order to prevent the vesting of his stock options. Since this claim was not asserted in the Complaint, the Court will not consider it.

cannot be the basis for a cause of action under § 1985(3)." *Sherlock v. Montefiore Med. Ctr.* 84 F.3d 522, 527 (2d Cir.1996) (quoting *Great Am. Fed. Savs. & Loan Ass'n v. Novotny,* 442 U.S. 366, 372, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979)). Furthermore, Plaintiff has not argued this claim in his brief and has provided no explanation, much less evidence, for the alleged conspiracy. Accordingly, this claim is dismissed.

### E. Breach of Contract

Courts have consistently held that the dismissal of a plaintiff's federal claims merits dismissal of his pendent state law claims. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Maric v. St. Agnes Hosp. Corp.,* 65 F.3d 310, 314 (2d Cir.1995)(citing *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)); *In re Merrill Lynch Ltd. P'ships Litig.,* 154 F.3d 56, 61 (2d Cir.1998). Having concluded that Defendants are entitled to summary judgment as to Plaintiff's underlying federal claims, this Court declines to exercise pendent jurisdiction over the corresponding State law claims. Plaintiff's State law claims are hereby dismissed without prejudice.

### CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED in all respects and the Complaint is Dismissed in full. The Clerk of the Court is directed to close this case.

SO ORDERED.